IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

AMERICAN ASSOCIATION OF
 BLOOD BANKS                          :

     v.                               :     Civil Action No. DKC 2008-2046

                                      :

BOSTON PATERNITY, LLC, et al.
                                      :

**MEMORANDUM OPINION**

Presently pending and ready for resolution are (1) a "motion to change venue" filed by Defendant John Quintal (Paper 6)[1]; (2) a "motion to dismiss all claims" filed by Defendant John Quintal (Paper 8); (3) a motion to dismiss for lack of personal jurisdiction filed by Defendants Boston Paternity, LLC ("Boston Paternity"), PST, Inc. ("PST"), John Quintal, and Joseph Quintal (Paper 16); and (4) Plaintiff's motion to file a surreply (Paper 26). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion to dismiss for lack of personal jurisdiction will be granted as to Defendants PST, John Quintal, and Joseph Quintal.[2] Because the court will grant the

---

[1] This motion was recast as a motion to dismiss. See paper 15.

[2] The motion to dismiss filed on behalf of some of the defendants notes that Plaintiff likely premised its inclusion of Ryan Quintal as a Defendant on an erroneous corporate filing by PST in New Hampshire, which inadvertently listed Ryan Quintal as a director of PST. Defendants attach the "Articles of Correction" that PST subsequently filed with the state of New Hampshire as
(continued...)

motion to dismiss for lack of personal jurisdiction (Paper 16) as
to Defendant John Quintal, the "motion to change venue" (Paper 6)
and the "motion to dismiss all claims against John Quintal" (Paper
8) will be denied as moot.  Plaintiff will be permitted to take
limited jurisdictional discovery as to Defendant Boston Paternity.
In addition, Plaintiff's motion to file a surreply will be denied.

**I.   Background**

Plaintiff American Association of Blood Banks ("AABB") is an
international not-for-profit organization, consisting of nearly
2,000 institutional members and 8,000 individuals involved in blood
banking, molecular testing, and related biological therapies.
Incorporated under the laws of the state of Illinois, Plaintiff
maintains its only office in Bethesda, Maryland.  Plaintiff owns
federal trademarks and service marks for AABB (U.S. Registration
No. 3,203,260) and AABB (Stylized)(U.S. Registration No. 3,195,463)
for use in connection with its services in the field of biological
therapies (collectively, the "AABB marks").

---

[2](...continued)
support for this assertion.  (Paper 16, Ex. 1).  They further
assert that Ryan Quintal has never had any contact with Maryland
and has no interest in either Boston Paternity or PST.  (Paper 16,
Quintal Aff., at 2).  There is no return of service for him and he
has not appeared in this action.  Plaintiff will be directed to
show cause why the complaint should not be dismissed against him
without prejudice pursuant to Local Rule 103.8.a.  Alternatively,
Plaintiff can agree to have the analysis for the other Quintals
applied to Ryan Quintal as well.

From its Maryland headquarters, Plaintiff develops standards relating to relationship and DNA testing, an important and often required element in determining U.S. citizenship and immigration status.  Plaintiff also operates websites under the AABB.org and AABB.info domain names, where users can access information about the goods and services it provides.  In addition, it maintains an accreditation program intended to improve the quality and safety of blood and blood products for qualifying individuals and institutions.  Plaintiff's accreditation program has various membership levels.  Institutional membership is only available to facilities that collect, process, test, or administer blood, or to facilities that provide cellular therapies or molecular testing services.  Affiliate membership is available to companies in the health profession that do not otherwise qualify for institutional membership status or are not licensed or registered by the U.S. Food and Drug Administration.[3]  Unlike institutional members, who have limited rights to use the AABB marks pursuant to AABB's Code of Ethics and Trademark Usage Guidelines ("Guidelines"), affiliate members are prohibited from using the AABB marks in any manner by the Guidelines.

---

[3] Plaintiff offers two levels of affiliate membership status: "Affiliate" and "Corporate Affiliate."  As Plaintiff notes, both of these levels confer only limited rights – such as discounts on AABB publications and products.  Because of the similarities between these two levels and for convenience of reference, "Corporate Affiliate" and "Affiliate" membership will be referred to simply as "affiliate membership."

Defendant Boston Paternity, a New Hampshire corporation with its principal place of business in New Hampshire, acts as a broker for DNA testing services that determine paternity and immigration status.  Boston Paternity markets "nationwide service" and also works with numerous foreign embassies abroad.  (Paper 19, Ex. L).  In January 2005, Boston Paternity applied for and received affiliate status with Plaintiff.  Since that time, Boston Paternity has renewed its affiliate membership with Plaintiff on an annual basis by mailing its membership dues to a P.O. Box in Baltimore, Maryland.

After Boston Paternity obtained affiliate status with Plaintiff, it posted the AABB logo on its homepage as well as on the Spanish, French, and Russian versions of its website.   In addition, in 2007, Defendants Boston Paternity and PST, a member of Boston Paternity and a New Hampshire corporation with its principal place of business in New Hampshire, registered four domain names consisting of the AABB marks: AABB.net, AABB.us, AABB.name, and AABB.bz.  Boston Paternity then used these domain names to host websites advertising its services.  During this time, John Quintal, President of PST and Boston Paternity, and a New Hampshire citizen and resident, also registered "AABB" as a trade name with the New Hampshire Department of State for use in association with "DNA Testing Services."  (Paper 19, Ex. F).

When Plaintiff learned of these activities, it sent cease-and-desist letters to Boston Paternity, warning that its use of the AABB marks violated AABB's guidelines for affiliate members.  When that method proved unavailing, Plaintiff brought an administrative proceeding before the World Intellectual Property Organization ("WIPO") requesting transfer of the AABB.net domain name.  On February 21, 2008, WIPO ruled in Plaintiff's favor and ordered Boston Paternity to transfer the AABB.net domain name to Plaintiff.

Despite losing at the WIPO proceeding, Boston Paternity, PST, and John Quintal continued their "unauthorized uses" of the AABB marks: in March 2008, PST registered three additional domain names consisting of the AABB marks - AABBtest.net, AABBtest.us, and AABBtest.org.  (Paper 1, at 2).  On August 6, 2008, Plaintiff filed an action in this court against Boston Paternity, PST, John Quintal, Joseph Quintal, and Ryan Quintal, asserting (1) violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (2) service mark and trademark infringement, 15 U.S.C. § 1114(1); (3) unfair competition and false designation of origin, 15 U.S.C. § 1125(a); (4) false description and representation, 15 U.S.C. § 1125(a); and (5) service mark and trademark infringement and unfair competition under Maryland common law.  (Paper 1).  Plaintiff alleges that Joseph Quintal and Ryan Quintal, also citizens and residents of New Hampshire, are directors of either PST or Boston Paternity.

On September 4, 2008, John Quintal, proceeding *pro se*, filed a "motion to change venue" on behalf of Boston Paternity, PST, Joseph Quintal, and himself. (Paper 6). He asserted that it would be unreasonable for the court to exercise personal jurisdiction over Defendants because they did not have sufficient contacts with the state of Maryland. The same day, John Quintal also filed separate motions to dismiss on behalf of PST, Joseph Quintal, and himself. (Papers 7, 8, 9). He requested that all claims against PST and himself be dismissed because AABB was attempting to pierce the corporate veil impermissibly by bringing an action against them. In addition, he argued that all claims against Joseph Quintal should be dismissed as Joseph Quintal was a minor and had not engaged in any meaningful business activities with PST.

On September 8, 2008, the court mailed a letter to John Quintal, informing him that, because he was not an attorney, he could only represent himself, and not the other Defendants, in this action. (Paper 10). The court also advised him that his motions to dismiss claims against PST and Joseph Quintal would be marked as "filed in error" and that the other Defendants could only appear through counsel. In response, John Quintal requested that the court convert his "motion to change venue" to a motion to dismiss for lack of personal jurisdiction on behalf of Boston Paternity, PST, Joseph Quintal, and himself. (Paper 13). The court granted this request as to John Quintal personally, but again informed him

6

that he could not represent any of the other Defendants. (Paper 15).

On September 26, 2008, Defendants Boston Paternity, PST, John Quintal, and Joseph Quintal, jointly represented by counsel, filed a motion to dismiss for lack of personal jurisdiction. (Paper 16). Defendants attached an affidavit by John Quintal to their motion, asserting that no Defendant resided in Maryland, had an office in Maryland, owned property in Maryland, had a collection site in Maryland, or derived revenue from Maryland.

Following Plaintiff's opposition and Defendants' reply, which included a supplemental brief filed three days after the deadline, Plaintiff moved to file a surreply. (Paper 26). Plaintiff requests that the court either strike Defendants' supplemental brief as untimely or permit Plaintiff to respond.

## II.  Motion to Dismiss for Lack of Personal Jurisdiction

### A.  Standard of Review

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003)(citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). If jurisdiction

turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits, and discovery materials, "the plaintiff need only make a *prima facie* showing of personal jurisdiction." *Carefirst*, 334 F.3d at 396; *see also Mylan*, 2 F.3d at 60. In determining whether the plaintiff has proven a *prima facie* case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan*, 2 F.3d at 60; *Carefirst*, 334 F.3d at 396.

**B.   Analysis**

Defendants argue that all claims against them should be dismissed for lack of personal jurisdiction as their contacts with Maryland are insufficient to establish either specific or general jurisdiction.[4] (Paper 16).

Plaintiff responds that specific jurisdiction over Defendants is proper for two reasons. First, Plaintiff argues that Defendants satisfied the Maryland long-arm statute and due process by (1)

---

[4] Plaintiff expressly notes that it does not seek to assert personal jurisdiction over Defendants based on a theory of general jurisdiction. (Paper 19, at 19). Accordingly, the court need not address whether Defendants are subject to general jurisdiction in Maryland.

becoming an affiliate member of AABB and mailing membership dues to Maryland on an annual basis; (2) placing Internet advertisements targeting Maryland residents; and (3) intentionally infringing the AABB marks through their various websites.   Second, Plaintiff asserts that Defendants' intentional infringement of the AABB marks alone is sufficient to establish personal jurisdiction because Defendants knew that AABB would feel the effects of the infringement in Maryland.   (Paper 19).

Plaintiff contends that Defendants are sufficiently intertwined such that their actions may be imputed to each other. (Paper 19).   Accordingly, Plaintiff argues that it need not address Defendants' contacts with the state of Maryland individually in order to establish personal jurisdiction over them.   Such an argument, however, contravenes the well-established law of personal jurisdiction.   It is axiomatic that the plaintiff bears the burden of establishing personal jurisdiction for each defendant individually.   *Calder v. Jones*, 465 U.S. 783, 790 (1984)("Petitioners are correct that their contacts with [the forum state] are not to be judged according to their employer's activities there. . . . Each defendant's contacts with the forum State must be assessed individually"); *see also Rush v. Savchuk*, 444 U.S. 320, 332 (1980)("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum.   The requirements of *International Shoe*, however, must be

met as to each defendant over whom a state court exercises jurisdiction"). Therefore, in deciding whether to grant Defendants' motion to dismiss for lack of personal jurisdiction, the court will assess each Defendant's contacts with the forum state on an individual basis.

A federal district court may exercise personal jurisdiction over a nonresident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). It has been said that Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003). Yet, courts may not "simply dispense with analysis under the long-arm statute," but rather, must interpret it "to the limits permitted by the Due Process Clause when [they] can do so consistently with the canons of statutory construction." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6, *cert. dismissed*, 548 U.S. 941 (2006). The constitutional question is whether the defendant purposefully established "minimum contacts" with Maryland such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l*

*Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

**1.  Maryland Long-Arm Statute/Due Process**

The Maryland long-arm statute provides, in relevant part:

> (a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

>> (1) Transacts any business or performs any character of work or service in the State;

>> (2) Contracts to supply . . . services . . . in the state;

>> (3) Causes tortious injury in the State by an act or omission in the State;

>> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State; . . .

Md. Code Ann., Cts. & Jud. Proc. § 6-103.   Plaintiff argues that Defendants' contacts with Maryland satisfy subsections (b)(1), (b)(3), and (b)(4).

### a.   Subsection (b)(1)

Plaintiff asserts that Defendants "transact[ed] business" in a manner sufficient to satisfy subsection (b)(1) in two ways. First, it argues that Defendants satisfied subsection (b)(1) because Boston Paternity, through the actions of John Quintal, mailed an application for affiliate membership to AABB's office in Bethesda, Maryland and then mailed membership dues to a P.O. Box in Baltimore, Maryland on an annual basis.  (Paper 19, at 12–13). Second, Plaintiff contends that Defendants satisfied subsection (b)(1) by using the AABB marks without authorization, in violation of the Guidelines. (*Id.* at 13–14).  Defendants counter that Boston Paternity's infrequent contact with AABB through mail is insufficient to qualify as "transacting business" within the meaning of subsection (b)(1).  (Paper 22, at 5).

It is well-established that "[a] nonresident who has never entered the State . . . may be deemed to have "transacted business" in the State within the meaning of subsection (b)(1). . . ." *Sleph v. Radtke*, 76 Md.App. 418, 427 (1988), *cert. denied*, 314 Md. 193 (1988).  Maryland courts, however, have repeatedly held that infrequent contact through mail alone is insufficient to satisfy subsection (b)(1).  For example, in *Craig v. Gen. Fin. Corp. of Illinois*, 504 F.Supp. 1033, 1038 (D.Md. 1981), the United States District Court for the District of Maryland declined to exercise personal jurisdiction over an Illinois defendant who sent multiple

letters to the plaintiff's employer in order to inform the employer of plaintiff's indebtedness to defendant, even though the plaintiff's cause of action arose from that contact.  Rather, the court construed the phrase "transacting business" narrowly, noting that subsection (b)(1) generally requires a defendant to conduct significant negotiations in the forum or intentionally advertise and sell products there.  *Id.*  Similarly, in *Marriott PLP Corp. v. Tuschman*, 904 F.Supp. 461, 467 (D.Md. 1995), *aff'd*, 97 F.3d 1448 (1996), the court refused to assert personal jurisdiction over a nonresident defendant simply because he mailed subscription payments into Maryland for the limited partnership that later brought suit against him.

Indeed, Maryland courts have asserted jurisdiction over nonresident defendants who have infrequently mailed payments and other correspondence into the state only when the defendants also had other purposeful contacts with Maryland, *i.e.*, by conducting significant negotiations with a Maryland corporation or entering into a contract in Maryland.  *See Jason Pharm., Inc. v. Jianas Bros. Packaging Co., Inc.*, 94 Md.App. 425, 432-34 (1993)(asserting personal jurisdiction over nonresident defendant who entered into one sales transaction with a Maryland corporation after conducting "extensive negotiations [with the corporation] over several weeks" and sending a $35,000 down payment into Maryland); *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md.App. 559, 569-70 (1993)(finding personal

13

jurisdiction over an Illinois corporation after it sent notices to the plaintiffs in Maryland, entered into a contract with the plaintiffs in Maryland, and later accepted plaintiffs' payments from Maryland).

Here, Plaintiff alleges that Defendant Boston Paternity, through John Quintal, transacted business within the meaning of subsection (b)(1) by sending a one-page application for AABB affiliate membership to Bethesda in January 2005 and subsequently mailing its annual membership dues to a P.O. Box in Baltimore in 2006, 2007, and 2008.  (Paper 19, at 12; Ex. B).  However, as noted in *Marriott*, such infrequent contact via mail is insufficient to satisfy subsection (b)(1).   Plaintiff does not allege any additional contact with Defendants - such as extensive negotiations or the formation of a contract in Maryland - to demonstrate that this limited contact by mail would qualify as "transacting business" within the meaning of subsection (b)(1).[5]  Defendant John Quintal, on the other hand, has submitted an affidavit, asserting that: (1) none of the Defendants maintains offices, actively

---

[5] The facts in the present case are also distinguishable from those in *CoStar Realty Info., Inc. v. Meissner*, 604 F.Supp.2d 757 (D.Md. 2009), a recent case in which this court exercised personal jurisdiction pursuant to subsection (b)(1) over a nonresident defendant who allegedly breached its licensing agreement with Maryland plaintiffs.  In *Meissner*, the defendant licensee entered into a contract with the plaintiffs, contacted them by phone, sent them transmissions via e-mail, and repeatedly accessed their Maryland-based servers.   *Id.* at 766.   Here, not only are the quality and quantity of contacts much more bare, but Plaintiff also never alleges that a contract was formed between the parties.

solicits business, or owns property in Maryland; and (2) none of the Defendants has ever provided services in Maryland or derived any revenue from Maryland customers. (Paper 16). As a result, the limited contact that Boston Paternity and John Quintal had with Plaintiff via mail does not satisfy subsection (b)(1).

In addition, Plaintiff asserts that Defendants' unauthorized use of the AABB marks, in violation of the Guidelines, is sufficient to satisfy subsection (b)(1). To support this proposition, Plaintiff cites *Young Again Prods., Inc. v. Acord*, 307 F.Supp.2d 713 (D. Md. 2004). Plaintiff's reliance on *Young Again Prods.*, however, is misplaced. In *Young Again Prods.*, the court asserted personal jurisdiction over a nonresident defendant who continued using a Maryland corporation's licensed marks after the distributorship agreement between the parties ended. *Id.* at 714–15. Contrary to Plaintiff's suggestion, the court did not base its decision on the defendant's continued use of the marks after the distributorship agreement ended. Rather, the court explained that jurisdiction over the defendant was proper because the parties "negotiated and entered into" the contract in Maryland. *Id.* at 717. As discussed above, Plaintiff makes no allegations that it negotiated or entered into a contract with any of the Defendants in Maryland. Accordingly, Plaintiff's argument that Defendants' violation of the Guidelines satisfies subsection (b)(1) fails.

15

Finally, because Plaintiff makes no additional allegations that any of the Defendants transacted business in Maryland, Plaintiff has failed to make a *prima facie* showing of specific jurisdiction pursuant to subsection (b)(1).

**b.    Subsection (b)(3)**

Plaintiff next asserts that the court can exercise personal jurisdiction over Defendants pursuant to subsection (b)(3) of the Maryland long-arm statute.  Maryland courts have long held that subsection (b)(3) requires both the tortious injury and the tortious act to occur in Maryland.  *Craig*, 504 F.Supp. at 1036-37; *Zinz v. Evans & Mitchell Indus.*, 22 Md.App. 126, 130 (1974), *cert. denied*, 272 Md. 751 (1974).  In defining the location of the tortious act in a trademark infringement case, however, courts have looked beyond the state in which the defendant commits the infringing act.  *See French Transit, Ltd. v. Modern Coupon Sys., Inc.*, 858 F.Supp. 22, 26 (S.D.N.Y. 1994).  Traditionally, "the tortious wrong of trademark infringement takes place in *either* the place where the infringer commits acts of infringement or in the place where customers are likely to be deceived and confused."  6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32.38 (4th ed. 2008)(emphasis added).

Against this background, Plaintiff argues that Defendants satisfied subsection (b)(3) because they placed Internet advertisements targeting Maryland residents and caused harm to both

16

Plaintiff, a Maryland resident, and Maryland consumers through their unauthorized use of AABB's marks.  (Paper 19, at 14–15). Specifically, Plaintiff cites two Boston Paternity advertisements appearing as "sponsored results" in online searches for paternity testing and medical laboratories near Baltimore and Towson, Maryland as evidence that Defendants' infringement would deceive and confuse Maryland customers.  (Paper 19, Brent LaBarge Decl., at 5).

Plaintiff's argument fails at the first step because, as Defendant correctly notes, the targeted advertisements to which Plaintiff refers did not exist at the time this claim arose.  It is axiomatic that "[o]nly contacts occurring prior to the event causing the litigation may be considered" for purposes of establishing specific personal jurisdiction. *Marriott*, 904 F.Supp. at 467 (quoting *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990)).  Here, Plaintiff's claim arises out of Defendants' unauthorized use of the AABB marks prior to the filing of the complaint, which occurred on August 6, 2008. The two advertisements that Plaintiff alleges Defendants used to target Maryland consumers, however, are dated September 2, 2008, and October 8, 2008, respectively.  (Paper 19, Exs. Q, S).  As a result, the court cannot consider them in determining whether Defendants committed their allegedly tortious acts in Maryland. Beyond these two advertisements, Plaintiff makes no additional

17

allegations that Defendants' infringing acts would likely deceive and confuse Maryland consumers.  Therefore, Plaintiff has failed to show that Defendants' conduct satisfied subsection (b)(3).

### c. Subsection (b)(4)

Plaintiff also argues that Defendants' contacts within Maryland rise to the level of a "persistent course of conduct" required to exercise jurisdiction pursuant to subsection (b)(4) of the Maryland long-arm statute.  Specifically, Plaintiff asserts that Defendants' intentional infringement of the AABB marks through its website, combined with its Maryland-targeted advertisements and the mailing of Boston Paternity's membership application and annual membership dues to Maryland, constitute a "persistent course of conduct" sufficient to satisfy subsection (b)(4).  (Paper 19, at 16-17).  In response, Defendants argue that online presence, even if that presence involves trademark infringement, does not confer personal jurisdiction unless the infringer directs its electronic activity into the forum state.  (Paper 22, 3-4).  Additionally, Defendants contend that contact through mail is insufficient to satisfy constitutional due process and that the court must disregard contacts arising after Plaintiff filed this action.  (*Id.* at 4-5).

The "persistent course of conduct" standard referenced in subsection (b)(4) is not tantamount to establishing general jurisdiction, but does require greater contacts than those

necessary to establish jurisdiction under subsection (b)(1).  *See Strong Pharm. Labs., LLC v. Trademark Cosmetics, Inc.*, No. RDB 05-3427, 2006 WL 2033138, *6 (D.Md. July, 17, 2006).  In its analysis, the court may consider a defendant's other contacts in addition to those developed via the Internet.  *See Dring v. Sullivan*, 423 F.Supp.2d 540, 546-47 (D.Md. 2006).  However, in order to establish a defendant's Internet contact with the forum state, the plaintiff must first show that the defendant did more than merely place information online.  *See Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002), *cert. denied*, 538 U.S. 1035 (2003).

The interactivity of a defendant's website can play a role in determining whether the court's exercise of personal jurisdiction over the defendant is proper.  *Carefirst*, 334 F.3d at 399.  The United States Court of Appeals for the Fourth Circuit distinguishes among interactive, semi-interactive, and passive websites in the following way:

> When a defendant runs an interactive site, through which he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet," he can properly be haled into the courts of that foreign jurisdiction. *Zippo* [*Mfg. Co. v. Zippo Dot Com, Inc.*], 952 F.Supp. [1119, 1124 (W.D.Pa. 1997)].  If, by contrast, the defendant's site is passive, in that it merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court. *Id.* . . . Occupying a middle ground are semi-interactive websites, through which there have not occurred a high volume of

> transactions between the defendant and residents of the foreign jurisdiction, yet which do enable users to exchange information with the host computer. "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs." *Zippo*, 954 F.Supp. at 1124.

*Id.* Based on this framework, the Fourth Circuit, in *Carefirst*, set forth the following standard to analyze the propriety of exercising personal jurisdiction over one who operates an Internet website:

> [A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*Id.* The court then applied this standard to determine whether a nonresident defendant, who had no physical presence in Maryland and did not solicit funds from individuals in Maryland, was subject to personal jurisdiction in Maryland for operating a website under a domain name that contained the plaintiff's trademark. *See id.* at 393–94. Noting that the website permitted users to exchange information with the host computer, but that only a single on-line transaction between a Maryland resident and the defendant had occurred, the court concluded that the defendant operated a semi-interactive website. *Id.* at 400. Despite the semi-interactive nature of the website, the court ultimately declined to exercise

20

personal jurisdiction over the defendant because the defendant did not direct its website into Maryland with the manifest intent of engaging in business or any other transaction in the state. *Id.* at 401. Rather, the defendant's website focused on providing services in the Chicago-area and made only a generalized request for donations. *Id.*

The Fourth Circuit's holding in *Carefirst* is particularly instructive in this case. Here, Boston Paternity's website could similarly be described as semi-interactive, as it contains a "live-chat" feature permitting users to discuss pricing with a representative, but there is no indication that Boston Paternity - or any other Defendant - ever entered into a transaction with a Maryland resident. In addition, like the defendant in *Carefirst*, Boston Paternity did not direct its website into Maryland with the manifest intent of engaging in any transaction within the state. As Plaintiff acknowledges in its opposition, Boston Paternity advertised "nationwide service," which courts have repeatedly found insufficient to satisfy the "[manifest] intent" standard. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)(holding that "[focusing] . . . generally on customers located throughout the United States and Canada without . . . targeting [the forum state]" was insufficient to establish personal jurisdiction), *cert. denied*, 523 U.S. 1048 (1998); *Carefirst*, 334 F.3d at 401. Thus, Defendants' unauthorized use of the AABB marks

on Boston Paternity's website does not alone constitute the "persistent course of conduct" required by subsection (b)(4).

In fact, even coupling the website with the application and payments that Boston Paternity mailed into Maryland proves inadequate to satisfy subsection (b)(4).[6] Maintenance of a website that allegedly infringes on another's trademark "does not establish minimum contacts sufficient for personal jurisdiction, in the absence of . . . evidence that any resident of the forum state has ever contracted with or even contacted the company." *Am. Info. Corp. v. Am. Infometrics, Inc.*, 139 F.Supp.2d 696, 702 (D.Md. 2001).

Finally, as Boston Paternity's mailing of the application and membership dues to Maryland on an annual basis were insufficient to satisfy subsection (b)(1), they are insufficient to satisfy subsection (b)(4) on their own. *See Strong Pharm. Labs.*, 2006 WL 20333138, at *6. Accordingly, Plaintiff has failed to demonstrate that Defendants' acts constituted the "persistent course of conduct" necessary to satisfy subsection (b)(4).

## 2. The Effects Test

Plaintiff further argues that jurisdiction is proper based on the "effects test" set forth in *Calder v. Jones*, 465 U.S. at 783,

---

[6] As previously discussed, the court cannot consider the two advertisements that Plaintiff alleges Defendants used to target Maryland residents because they are dated after Plaintiff filed the complaint.

because Defendants intentionally infringed on the AABB marks, knowing that Plaintiff would feel the effects of that infringement in Maryland. (Paper 19, at 19). Defendants counter that the court cannot exercise personal jurisdiction over them merely because Plaintiff felt the effects of the alleged infringement in Maryland. (Paper 22, at 7).

The effects test requires that a plaintiff establish three elements:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*Carefirst,* 334 F.3d at 398 n.7.

Plaintiff relies heavily on *Cole-Tuve, Inc. v. Am. Mach. Tools Corp*, 342 F.Supp.2d 362 (D.Md. 2004), to support its argument. In *Cole-Tuve*, Plaintiff Cole-Tuve, a Maryland corporation with its only business in Maryland, operated a website registered as *coletuve.com*. *Id.* at 364-65. The defendant, an Illinois corporation, registered the domain name *cole-tuve.com* and used it as an "error page," so that any Internet user who mistakenly typed *cole-tuve.com* would be directed to its, rather than to Cole-Tuve's, website. *Id.* The plaintiff filed a trademark infringement action against the defendant, who moved to dismiss for lack of personal jurisdiction. The district court denied the defendant's motion to

23

dismiss, holding that jurisdiction was proper because the defendant had intentionally registered the domain name in order to redirect Maryland customers away from a Maryland business. *Id.* at 368. Emphasizing that a plaintiff will always feel the brunt of such harm in his or her home state, the court explained that "the Fourth Circuit has seemed to require more than the *Calder* 'effects-test' to hold exercises of jurisdiction over foreign tortfeasors constitutional." *Id.* at 367. The court ultimately found this "something more" requirement satisfied because the plaintiff's only business - and hence only customers - were in Maryland, making Maryland the defendant's only possible target. *Id.* at 367-68.

Here, Plaintiff attempts to analogize its situation to that in *Cole-Tuve*, arguing that, like the defendant in *Cole-Tuve*, "Defendants attempted to redirect Internet traffic from AABB's official . . . websites to Defendants' own websites." (Paper 19, at 21). Plaintiff also repeatedly asserts that Defendants knew Plaintiff operated its business from Maryland and that Plaintiff would feel the harm of Defendants' infringement in Maryland, thereby satisfying the effects test. (*Id.* at 20). Plaintiff's argument is unpersuasive for two reasons.

First, while Plaintiff may be correct in its assertion that Defendants attempted to redirect Internet traffic from its websites, there is absolutely no indication that Defendants specifically targeted Plaintiff's Maryland customers as part of

24

this scheme, a critical factor in the *Cole-Tuve* decision.  In fact, Plaintiff itself notes that it "is an *international* association" with active members "in *all* 50 states and 80 countries."  (Paper 22, Ex. 1)(emphasis added).

Second, asserting personal jurisdiction over Defendants merely because they knew that Plaintiff's office was in Maryland and that Plaintiff might suffer harm there would essentially make a plaintiff's decision about residence dispositive in every jurisdictional inquiry, an outcome that the Fourth Circuit has flatly rejected.  *ESAB Group Inc.*, 125 F.3d at 626; *see also Young*, 315 F.3d at 262 (declining to exercise personal jurisdiction over nonresident defendants who published an allegedly defamatory online article about the Virginia plaintiff, even though the defendants "were all well aware" that the plaintiff was employed and resided in Virginia, and that any harm suffered by plaintiff would primarily occur in Virginia).  As discussed above, Plaintiff must instead show that Defendants directed their website content to a Maryland audience and manifested an intent to target Maryland consumers.  *Carefirst*, 334 F.3d at 399.  Because Plaintiff wholly fails to do so, Plaintiff cannot assert personal jurisdiction over any of the Defendants pursuant to the effects test.

### 3.   Request to Take Jurisdictional Discovery

Plaintiff next contends that, if the court finds that Plaintiff did not make its *prima facie* showing of personal

jurisdiction, the court should permit it to take limited jurisdictional discovery in order to "[ascertain] the full extent of Defendants' contacts with Maryland." (Paper 19, at 24). Specifically, Plaintiff requests jurisdictional discovery to: (1) examine fully Defendants' promotional efforts in Maryland; (2) explore the functionality of the chat feature on the Boston Paternity website; and (3) determine whether Defendants have provided services or derived revenue in Maryland. (*Id.*)

The Federal Rules of Civil Procedure freely permit discovery that is broad in scope, but "district courts have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." *Mylan*, 2 F.3d at 64 (quoting *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)) (alterations in original). "When a plaintiff offers only speculation or conclusory assertions about [a defendant's] contacts with a forum state" in the face of specific denials made by the defendant, the court is within its discretion to deny the plaintiff's request for jurisdictional discovery. *Carefirst*, 334 F.3d at 402-03; *see also Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988).

Here, Plaintiff alleges that Boston Paternity established contacts with Maryland through its website, its annual correspondence with Plaintiff via mail, and its Maryland-targeted advertisements. As previously discussed, the websites and mail

26

correspondence are both insufficient to comport with Maryland's long-arm statute and the Due Process Clause.  In addition, the court could not consider either of the Maryland-targeted advertisements cited by Plaintiff because they arose after Plaintiff filed its complaint.

The court will nonetheless grant Plaintiff's request for limited jurisdictional discovery as to Defendant Boston Paternity. In his affidavit, John Quintal asserts that Boston Paternity does not derive revenue from Maryland, conduct business in Maryland, or "actively solicit" business in Maryland, but he does not assert that Boston Paternity has never advertised in Maryland. (Paper 16, Quintal Aff., at 2).  Because Maryland-targeted advertisements placed prior to the filing of the complaint could affect the personal jurisdiction analysis, Plaintiff's request to take jurisdictional discovery as to the scope of Defendant Boston Paternity's promotional efforts in Maryland is warranted.  *See* *Carefirst*, 334 F.3d at 403 (indicating that jurisdictional discovery would be proper where additional information sought by the plaintiff would alter the analysis of personal jurisdiction).

However, Plaintiff's request to explore the chat feature on Boston Paternity's website will be denied because, as previously discussed, a website's interactivity can alter the jurisdictional analysis only where a defendant has used the site to engage in transactions with residents of the forum state.  *See id.* at 399.

27

As John Quintal notes in his affidavit, Boston Paternity has never conducted business in Maryland.  (Paper 16, Quintal Aff., at 2). In addition, Plaintiff's request to verify whether Defendant Boston Paternity derived revenue or provided services in Maryland is unwarranted as the affidavit submitted by John Quintal adequately addresses these inquiries and Plaintiff has provided no indication of fraud or intentional misconduct therein.

Similarly, Plaintiff's request to take jurisdictional discovery as to the remaining Defendants will be also denied. Other than asserting that Defendant John Quintal personally mailed Boston Paternity's application and annual membership dues to Maryland, Plaintiff does not allege that the remaining Defendants have any additional contacts in Maryland.  Plaintiff's request is thus akin to a "fishing expedition" and jurisdictional discovery is not warranted.  *See id.* at 403.  Accordingly, all claims against Defendants PST, John Quintal, and Joseph Quintal will be dismissed for lack of personal jurisdiction.

### III. Motion to File a Surreply

Defendants filed a supplemental brief in support of their reply on November 10, 2008, three days after the November 7, 2008 deadline.[7]  (Paper 25).  Because Defendants failed to file its

---

[7] Local Rule 105(2)(a) states that a party must file a reply memorandum within eleven days after service of the opposition. Federal Rule of Civil Procedure 6(d) also provides three additional days for electronic filings.  As Plaintiff filed its opposition on
(continued...)

supplemental brief in a timely manner, the arguments raised therein will not be considered.

In response to Defendants' supplemental brief, Plaintiff moved to file a surreply. (Paper 26). Plaintiff raises two arguments. First, in what resembles a motion to strike, Plaintiff requests that the court exclude the supplemental brief as untimely. (*Id.* at 2). As noted above, the court will not consider any arguments that Defendants raise in the supplemental brief, rendering Plaintiff's request moot. Second, Plaintiff requests that the court permit it to file a surreply in order to respond to Defendants' supplemental brief. (Paper 26). Because the court will not consider the arguments raised by Defendants in their supplemental brief, Plaintiff's motion to file a surreply will be denied. Indeed, even if Plaintiff's surreply were permitted, the outcome of the case would not change because Plaintiff does not provide any additional information to demonstrate that exercising personal jurisdiction over Defendants is proper.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss for lack of personal jurisdiction will be granted as to Defendants PST, John Quintal, and Joseph Quintal. Because the court will grant Defendants' motion to dismiss for lack of personal jurisdiction as

---

[7](...continued)
October 24, 2008, Defendants had fourteen days - or until November 7, 2008 - to file their reply.

to Defendant John Quintal, Defendant John Quintal's *pro se* "motion to change venue" and "motion to dismiss all claims" will be denied as moot.  Plaintiff's request to take limited jurisdictional discovery will be granted as to Boston Paternity only.   In addition, the court will deny Plaintiff's motion to file a surreply.  A separate Order will follow.


                                                       _____/s/_____
                                                       DEBORAH K. CHASANOW
                                                       United States District Judge